## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

MARCUS ANTHONY BARNES

CRIMINAL CASE NO.

1:14-cr-00268-SCJ-RGV

## MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER

Defendant Marcus Anthony Barnes ("Barnes" or "defendant"), is charged in a four-count indictment with knowingly and intentionally possessing, with the intent to distribute, at least five hundred (500) grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(ii); knowingly possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i); knowingly possessing a firearm after having been previously convicted of a felony offense, in violation of 18 U.S.C. § 922(g)(1); and knowingly possessing thirteen silencers with no serial numbers, which were not registered to him, in violation of 26 U.S.C. § 5861(d).  [Doc. 1].[1]  Barnes has moved to suppress evidence obtained as a result of a traffic stop that occurred on March 26, 2014, [Doc. 24], as well as evidence obtained

_____

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

as a result of the execution of a search warrant at a residence that also occurred on

March 26, 2014, [Doc. 25].   Following an evidentiary hearing initially held on

January 30, 2015, and continued on February 5, 2015,[2] the parties filed post-hearing

briefs on the motions.  See [Docs. 73, 74, 81, 82, & 85].  For the reasons that follow,

---

[2] See [Docs. 64 & 65] for the transcripts of the evidentiary hearings.  Citations to the evidentiary hearing transcripts hereinafter will be referred to as "(Tr. at ___)." The parties also submitted exhibits at the hearings, which will be referred to as "(Gov. Ex. ___)" for the government's exhibits and "(Def. Ex. ___)" for defendant's exhibits.  In addition, Barnes has filed an unopposed motion to correct errors in the transcripts, [Doc. 77], and upon review of the recordings from both hearings in comparison to the portions of the transcripts Barnes seeks to correct, the Court finds that Barnes is correct, although none of the corrections are material to his arguments, and his motion is therefore **GRANTED**.  Accordingly, the Court will accept Barnes' corrected portions of the transcripts as set forth in his motion, [Doc. 77], as well as in his post-hearing brief, see [Doc. 81 at 8 n.3], in ruling on the pending motions to suppress, and the Court Reporter will file an amended transcript.  Barnes has also filed a motion for leave to file a sur-reply to the government's reply in opposition to suppressing evidence as a result of the traffic stop, [Doc. 86], and although "[n]either the Federal Rules nor the Court's Local Rules allow sur-reply briefs as a matter of right, and the Court normally does not permit sur-replies," USMoney Source, Inc . v. Am. Int'l Specialty Lines Ins. Co., No. 1:07-cv-0682-WSD, 2008 WL 160709, at *2 n.5 (N.D. Ga. Jan. 15, 2008), rev'd on other grounds, 288 F. App'x 558 (11th Cir. 2008) (per curiam) (unpublished) (citation omitted); see also Leatherwood v. Anna's Linens Co., 384 F. App'x 853, 857 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted), "the Court may in its discretion permit the filing of a surreply . . . where a valid reason for such additional briefing exists, such as where the movant raises new arguments in its reply brief," Fedrick v. Mercedes-Benz USA, LLC, 366 F. Supp. 2d 1190, 1197 (N.D. Ga. 2005 ) (citations omitted). Barnes seeks leave to file a sur-reply to address arguments raised by the government for the first time in reply briefing; namely, a recent case citation and arguments presented by the government concerning Barnes' driving.  See [Doc. 86-1]. Accordingly, Barnes' motion for leave to file a sur-reply, [Doc. 86], is **GRANTED**, and the clerk is **DIRECTED** to enter Barnes' sur-reply, [Doc. 86-1], on the docket.

it is **RECOMMENDED** that Barnes' motions to suppress, [Docs. 24 & 25], be

**DENIED**.

## I. STATEMENT OF FACTS

**A.**    <u>Traffic Stop</u>

On March 26, 2014, uniformed DeKalb County Police Department Officer

Ronnie Viar ("Officer Viar"),[3] participated in a surveillance operation of Barnes in

Stone Mountain, Georgia, as part of an investigation that had been initiated in July,

2013, by DeKalb County narcotics detectives.[4] (Tr. at 34, 62; Gov. Ex. 19). During the

---

[3]At the time of the January 30, 2015, evidentiary hearing, Officer Viar had been employed with the DeKalb County Police Department for 14 years, and he was assigned to the narcotics unit as a K-9 officer at the time of the traffic stop at issue. (Tr. at 16-17, 84). Viar has been in law enforcement for approximately 24 years, (Tr. at 17), and as a narcotics officer with DeKalb County, his responsibilities included initiating traffic stops, performing highway interdiction, and assisting detectives in their cases, among other things, (<u>id.</u>). He testified that he had received training in the identification and packaging of narcotics and the execution of search warrants, (Tr. at 18-19), and that he had been a K-9 handler with DeKalb County since 2008, (Tr. at 19). Officer Viar's K-9 was primarily a narcotics detection dog and did not aid in the apprehension of fugitives. (Tr. at 20). Officer Viar testified that his K-9 at the time of the challenged traffic stop was named "Basa," that he had handled Basa from 2008 through August of 2014, when Basa retired, and that Basa was certified to detect the odor of marijuana, cocaine, heroin, and methamphetamine at all relevant times in this case. (Tr. at 21-32, 72); <u>see also</u> (Gov. Exs. 1-15). Officer Viar testified that Basa "sits down" to alert to the presence of the odor of narcotics. (Tr. at 33-34, 48, 72-73).

[4] Barnes had been under surveillance on several prior occasions, (Tr. at 162-68), and DeKalb County Police Department Sergeant J.C. Pitts ("Sergeant Pitts"), testified that he had made the determination that if the opportunity presented itself on March 26, 2014, "it would not just be a surveillance operation [of Barnes], there

surveillance operation, Officer Viar, who also had Basa and DeKalb County Police Sergeant Cusamano as passengers in his marked patrol vehicle, received information via a secure police radio channel that Barnes was driving toward him on Lilburn-Stone Mountain Road in a white Chevrolet Impala, and as Barnes passed him, Officer Viar pulled in behind Barnes and continued to follow him in an attempt to "develop probable cause for a traffic stop."[5]  (Tr. at 34-37, 42-43, 60-64, 96, 120-21, 339, 341; Def. Ex. 18).

As Barnes drove down Lilburn-Stone Mountain Road, he came to a stop light and made a left turn onto Old Stone Mountain Road, at which point Officer Viar testified that Barnes accelerated "up the hill."  (Tr. at 37, 39, 75-77, 342-44, 369). Officer Viar continued to follow Barnes, maintaining the same distance directly

_____

would be enforcement," on that day, meaning a traffic stop, if supported by probable cause, as the officers believed, based on Barnes' history, that "it would be safer for officers involved if a traffic stop was conducted in dealing with [Barnes], if [they] were going to take enforcement action," (Tr. at 256-59, 265-66, 270).  On direct examination, defense counsel played an audio tape in which Sergeant Pitts stated that "[t]his is a definite 1048," meaning traffic stop, (Tr. at 264, 268; Def. Exs. 4 & 16); however, Sergeant Pitts testified that it was a "standing order with the DeKalb County Police Department with [his] unit that if no probable cause exists for a traffic [s]top, a traffic stop is not going to be conducted unless information is given in reference to an investigative stop, or something like that," (Tr. at 260), and that it was up to the officer who would be initiating the stop to determine if there was probable cause, (Tr. at 265-67).

[5] Officer Viar testified that he had encountered situations where he was unable to develop probable cause for a traffic stop and that in those instances, the suspect would just continue on and he would not initiate a traffic stop.  (Tr. at 37).

behind him, and as they continued to travel down Old Stone Mountain Road, Officer Viar "paced"[6] Barnes' vehicle for "[a]bout half a mile to a mile," (Tr. at 41), and determined that Barnes was driving approximately 50 miles per hour, which fluctuated at times up to "about 52," in a 40-mile per hour zone.  (Tr. at 39-41, 43, 76, 94, 119, 369).  Upon concluding that Barnes was speeding, Officer Viar activated his blue lights and initiated a traffic stop.  (Tr. at 39-40, 42).[7]  After Barnes pulled over

---

[6] Officer Viar testified that "pacing" is a speed detection device employed by law enforcement whereby an officer follows another vehicle while maintaining the same distance between the vehicles "for at least two-tenths of a mile or a quarter mile."  (Tr. at 40, 94, 119).  He explained that "as long as [the] speeds stay the same, [he] can determine what [the other vehicle's] speed is[.]"  (Tr. at 40, 93).  Officer Viar testified that he had received training on using the pacing technique and that he had previously conducted traffic stops based on pacing.  (Tr. at 40).  In this instance, Officer Viar testified that the speedometer in his patrol vehicle was calibrated from the factory and that the GPS in his vehicle also had a speedometer which matched the speed of his vehicle's speedometer.  (Tr. at 41-42).  Officer Viar also testified that there was no traffic when he was following Barnes and that nothing impeded his view of Barnes, (Tr. at 44); however, defense counsel pointed out on cross-examination that in his police report, Officer Viar noted that after he stopped Barnes, he asked Barnes "if he would mind stepping out of the vehicle due to the roadway being narrow and heavy traffic," (Tr. at 58).  Barnes also testified at the evidentiary hearing that there was heavy traffic at the time of the traffic stop, (Tr. at 343-44), though he agreed that Officer Viar remained directly behind him with no other vehicles between them, (Tr. at 370).

[7] Contrary to Officer Viar's testimony that Barnes was speeding, Barnes testified that he was driving "very cautious[ly]" because he knew an officer was behind him and he did not want to get pulled over.  (Tr. at 345, 371-72).  Additionally, Curtis Dwayne Canupp ("Canupp"), with Canupp Accident Reconstruction and Investigative Services, testified  as an expert witness on behalf of Barnes at the evidentiary hearing.  (Tr. at 213-14; Def. Ex. 13).  Canupp testified that he was a retired Cobb County police officer, that he had been with Cobb County

to the side of the road, Officer Viar, with his weapon holstered, exited his vehicle alone, approached the driver's side of Barnes' vehicle, and, after observing Barnes "fumbling in the center console," asked Barnes to exit the vehicle and produce his driver's license and registration.  (Tr. at 43-45, 86, 345).

Barnes asked Officer Viar if he could smoke, and Officer Viar said that he could and observed that Barnes was "shaking lighting the cigarette."  (Tr. at 45, 91, 115).  Officer Viar advised Barnes that he had stopped him for speeding at a rate of 50 miles per hour in a 40-mile per hour zone, and Barnes apologized and stated that he was not paying attention, though at the evidentiary hearing, Barnes denied

---

for 20 years, that his primary job was fatality accident investigation and serious injury investigation, and that he taught accident investigation and radar certification courses, some of which included a form of pacing.  (Tr. at 215-17, 232-33).  Canupp defined pacing as a vehicle following another vehicle while maintaining the same distance for a quarter to a half a mile and observing the speed on the speedometer or on a radar unit while doing that.  (Tr. at 217-18, 228-30, 246).  He testified that the optimal surface for pacing was primarily a flat surface, a straightaway, or a long sweeping curve, but not a hilly area.  (Tr. at 218-19, 238-40, 246).  Canupp testified that he drove on Lilburn-Stone Mountain Road and Old Stone Mountain Road where the traffic stop occurred, and that the roadway was "always up and down and curving" and "[n]ot a good scenario to try to do any type of pacing," and that in his opinion, Old Stone Mountain Road was not a proper roadway on which to conduct pacing because "you are always either on your gas or on your brake" and "[y]ou're never at a smooth glide at any point to where it would be safe to do so, or appropriate to try to follow a vehicle in front of you at the same distance."  (Tr. at 219-24, 242, 246-48; Def. Ex. 14).  However, Canupp also testified that he did not actually attempt to pace a vehicle on Old Stone Mountain Road and that he was not sure whether there was a quarter mile stretch on the road where a constant speed could be maintained "because [he] could not maintain on that road at all."  (Tr. at 236, 241-42, 249, 252-53).

having said so.  (Tr. at 45-46, 372).  Officer Viar then took Barnes' driver's license,

returned to his patrol vehicle to run a check on it, and discovered that Barnes was

on probation.  (Tr. at 46, 87).  When Officer Viar returned to Barnes' vehicle, he

asked Barnes why he was on probation, and Barnes responded that he previously

had a drug problem.  (Tr. at 46, 89, 345).[8]  Officer Viar then asked Barnes whether he

had any drugs in his vehicle and whether he could search his vehicle, and according

to Officer Viar, Barnes  replied without hesitation that he could search his vehicle.

(Tr.  at 46-47, 96-97).[9]  Thereafter, Officer Viar deployed Basa and conducted an

"open-air sniff" of Barnes' vehicle.[10]  (Tr. at 47, 373).  Basa alerted to the presence of

the odor of narcotics at "the center of the driver and passenger door area."  (Tr. at

---

[8] Officer Viar testified that when he returned to speak with Barnes and asked him about his probation, he did so for officer safety.  (Tr. at 89-90).  He explained that he typically asked questions related to probation or parole if a license check returned with those items so that he could "see what [he's] dealing with on the side of the road."  (Tr. at 121).  He also stated that from the point he asked Barnes about his probation, his efforts were directed toward searching the vehicle.  (Tr. at 89, 91).

[9] Officer Viar testified that he had a conversational tone with Barnes, did not draw his weapon, and had not restrained Barnes or touched him in any way up to this point, (Tr. at 47), and that Sergeant Cusamano was standing with Barnes as well at this time, (Tr. at 47, 97).  Barnes, however, testified that Officer Viar never asked him for consent to search the vehicle, but that he only asked him whether there were any drugs in the vehicle, to which he said, "No, not to my knowledge."  (Tr. at 347, 373-74).  Officer Viar did not obtain written consent from Barnes.  (Tr. at 97).

[10] Officer Viar explained that during an open-air sniff, he would "start in the beginning of the vehicle, in the center of the vehicle front and walk the dog around the exterior, back to the original point where [he] started."  (Tr. at 47-48).

48).  Following Basa's alert, Officer Viar opened the driver's side door, allowed Basa inside the vehicle, and shut the door, at which time Basa alerted to the dashboard area of the vehicle.  (Id.).  Officer Viar then placed Basa back in his patrol vehicle and he returned to Barnes' vehicle to conduct a search of the interior of the vehicle.  (Tr. at 49).  In particular, Officer Viar observed that the air bag panel on the passenger side of the dashboard appeared altered so he retrieved a tool from his patrol vehicle, raised the flap of the air bag, and identified what appeared to be a kilogram of cocaine and a firearm.[11]  (Id.).  At this time, Officer Viar placed Barnes under arrest,[12] and he relayed his findings to Detective Ellis J. George ("Detective George") and Sergeant Pitts, the narcotics detectives conducting the surveillance operation.  (Tr. at 50-51, 177-79, 210).[13]

_____

[11] Officer Viar field tested the substance, which was positive for cocaine.  (Tr. at 50).

[12] Officer Viar testified that approximately 5 to 10 minutes elapsed between the activation of his blue lights and the open-air sniff and that approximately 15 to 20 minutes elapsed between the activation of his blue lights and placing Barnes under arrest.  (Tr. at 51-52); see also (Gov. Ex. 20; Def. Ex. 1).

[13] During cross-examination, defense counsel asked Officer Viar about his disciplinary history, and he testified that he received a written reprimand for using inappropriate language, though he could not recall if it was specifically for a Fourth Amendment violation.  (Tr. at 105, 107-08, 110-12); see also (Def. Ex. 2).

**B.**   **Search of the Residence Pursuant to a Search Warrant**

Following the traffic stop, Detective George applied for and received a search warrant on March 26, 2014, for the residence located at 5706 Mountain Crescent Court, Stone Mountain, Georgia.  [Doc. 25-1 at 2-7]; see also (Tr. at 160-61, 177-79, 210; Gov. Ex. 19).[14]   In the affidavit in support of the application for the search warrant, Detective George recounted his employment history with the DeKalb County Police Department and his current role with the DeKalb High Intensity Drug Trafficking Area ("HIDTA") Task Force,[15] and he then detailed an investigation and surveillance that had been ongoing since July, 2013.  [Doc. 25-1 at 2-3].  Specifically, Detective George relayed that during the first week of July, 2013, he and other members of DeKalb HIDTA surveilled a residence located at 2459 Wagon Trace in Lawrenceville, Georgia, and that "[d]etectives learned through a confidential source

---

[14] During the evidentiary hearing, the issue of Barnes' standing to challenge the search of the residence was raised since the residence at issue is in fact the home of Barnes' girlfriend, Nekia Shaquanja Waters.  See (Tr. at 144-47).  Following Barnes' testimony and the evidence submitted, see (Tr. at 145-57); see also (Def. Ex. 5), the Court found Barnes had established standing to challenge the search of the residence, (Tr. at 158).  In addition, while Barnes initially raised an issue with regard to the timing of the search warrant in relation to the traffic stop of Barnes, see [Doc. 25 at 1, 10-11], the undisputed testimony at the hearing was that Detective George presented the application and affidavit in support of the application for the warrant after Barnes was stopped and subsequently placed under arrest, see (Tr. at 177-79).

[15] Detective George testified at the evidentiary hearing that he had been employed with the DeKalb County Police Department for seven years, and that he had been assigned to HIDTA for the last two years.  (Tr. at 159, 182).

of information that this location was a residence where narcotics were being stored and sold," and that "on the day of [the] surveillance operation there would be narcotics sold at that location."  [Id. at 3]; see also (Tr. at 161-62).[16]  Thereafter, detectives observed a red Cadillac CTS pull into the garage of the surveilled location, after which the garage door was closed until about two hours later when the Cadillac backed out of the garage and drove away from the location.  [Doc. 25-1 at 3]; see also (Tr. at 162).  Detectives followed the Cadillac and were able to identify the driver as Barnes and the passenger as Jonathan McNeal ("McNeal").  [Doc. 25-1 at 3]; see also (Tr. at 163-65, 204).

Detective George described in the affidavit that during the surveillance of the vehicle, Barnes conducted "numerous 'heat checks,'" which he defined as a "term used by law enforcement referring to basic maneuvers used to identify surveillance[.]" [Doc. 25-1 at 3]; see also (Tr. at 165-66 (Detective George's testimony that "heat checks" means "counter surveillance to make sure not only to see if law enforcement is following him, but to make sure that any other individuals possibly

---

[16] Detective George testified that the confidential source had provided information to DeKalb law enforcement in the past that had been corroborated and that had led to other arrests, (Tr. at 163); however, he did not relay this information to the magistrate when he presented the application and affidavit for the search warrant, (Tr. at 181-82). On cross-examination, Detective George acknowledged that there was no mention of a confidential source in his court supplemental reports and that he never personally spoke with the informant, but rather, other detectives dealt with this informant. See (Tr. at 182-88; Def Exs. 6 & 7).

trying to rob him are not following him"), 193, 211-12). He explained that because of these maneuvers, detectives briefly lost contact with Barnes' vehicle, but that Sergeant Pitts later located it parked in the driveway of 781 3rd Street, Stone Mountain, Georgia, and observed Barnes leave that location and make "several stops at various convenience stores . . . while continuing to check every parking lot he parked in to see if he was being followed." [Doc. 25-1 at 3]; see also (Tr. at 163). Detective George also described that when Barnes left one of the convenience stores, he turned onto a road and "abruptly stopped in the middle of the street," which "appeared to be another 'heat check' and caused [Detective George] to drive around [Barnes] as he idled in the roadway." [Doc. 25-1 at 3]; see also (Tr. at 166, 188-89). Detective George stated that once he had passed Barnes, Barnes parked his vehicle on the side of the road and "sat there for approximately five minutes" before leaving and turning onto Mountain Crescent Court. [Doc. 25-1 at 3]; see also (Tr. at 166).

Approximately one week later, detectives located Barnes' vehicle parked in the driveway of 5706 Mountain Crescent Court, Stone Mountain, Georgia, and Detective George described this location as "fenced with several pit bulls in the back yard" and "surveillance cameras mounted around the house," which he noted was "commonly seen at locations where narcotics and/or bulk sums of U.S. currency are housed in an effort to see any approaching law enforcement or surveillance." [Doc.

25-1 at 3]; see also (Tr. at 167-68).  Detective George explained that detectives later determined Barnes resided at this address.  [Doc. 25-1 at 3]; see also (Tr. at 166-67).

Detective George averred that for the next several months, detectives attempted to initiate several mobile surveillance operations on Barnes, but that due to his "being extremely surveillance conscience and performing countless 'heat checks' each operation was terminated to preserve the investigation." [Doc. 25-1 at 3].  Subsequently, during the first week of October, 2013, detectives identified Building E at Lakes Apartments as a "location where drugs were being sold," and they observed Barnes arriving and staying at this location for about one hour.  [Id.]; see also (Tr. at 168-69).[17]   Detectives did not observe Barnes or his vehicle for the next several months and subsequently discovered that Barnes had wrecked his vehicle in an accident.  [Doc. 25-1 at 3].

During the second week of March, 2014, Detective George, along with other detectives, surveilled a residence located at 8312 Pleasant Hill Road in Lithonia, Georgia, and they observed Barnes' vehicle parked in the driveway of this location. [Id. at 4].  After Barnes left this location, they observed him performing "'heat checks'" as he arrived at a nearby plaza, and after going into the plaza for some

---

[17] At the evidentiary hearing, Detective George testified that Building E of the Lake Apartments was a multi-story, multi-unit residential building and that the detectives could not observe which unit Barnes visited.  (Tr. at 195-98); see also (Def. Exs. 8-12).

time, he left and returned to the Pleasant Hill location, at which time detectives observed a gold Buick LeSabre arrive and pull in behind Barnes' vehicle.  [Id.]. Detective George explained that the driver of the Buick was later identified as Timothy Spencer Banks ("Spencer"),[18] and they observed Spencer go inside of the Pleasant Hill location and then exit after ten minutes.  [Id.].  Detectives maintained mobile surveillance on Spencer during which they observed him fail to use a turn signal while turning onto Martin Road, and they initiated a traffic stop, which led to the discovery of cocaine and a concealed firearm.  [Id.]; see also (Tr. at 201, 291, 311-12).  Spencer was "subsequently arrested and charged with trafficking cocaine, giving a false name and possession of a hand gun during VGCSA."  [Doc. 25-1 at 4]; see also (Tr. at 286).[19]

---

[18] Spencer was arrested under the name "Timothy Spencer," but at the February 5, 2015, evidentiary hearing, he testified that he had changed his name to "Timothy Elwood Spencer Banks."  (Tr. at 283, 286).

[19] Detective George testified at the hearing that upon Spencer's arrest, Spencer told him that he did not receive any cocaine from Barnes on that day, but that he had given money to Barnes, who then gave it to McNeal and that once he got the narcotics, Barnes gave them to Spencer.  (Tr. at 204-05).  Detective George testified that Spencer described Barnes as "the middle man between him and [McNeal]."  (Tr. at 212).  He further stated that Spencer told him that he and Barnes would "from time to time . . . sell drugs out of Apartment E" and that he "would do anything in reference to helping his girlfriend out, that he would help us out in reference to trying to take [] Mc[Neal] . . . and [Barnes] [] into custody."  (Tr. at 205-06, 212).  However, Spencer, who has known Barnes since 1999 and considers him "like a brother," (Tr. at 302, 325-27, 329), provided a sworn declaration, in which he avers that he did not purchase or receive any illegal narcotics from Barnes or anyone else

Detective George included in the affidavit a summary of the events that occurred on March 26, 2014.   He described that Barnes was under mobile surveillance and that detectives observed him leave the 5706 Mountain Crescent Court location in a white Chevrolet Impala, "travel to a possible location known to distribute large amounts of illegal narcotics," pull his vehicle into the garage with

---

at the Pleasant Hill Road location on March 12, or on any other date; that when he was arrested on March 12, he advised officers that he had not received any illegal drugs from Barnes or from the Pleasant Hill house; and that in response to the officers requesting his cooperation in the investigation, he told them that Barnes did not sell drugs, [Doc. 25-1 (Spencer Decl.) at 11-12 ¶¶ 2-5]; see also (Tr. at 306, 308, 336-37; Def. Ex. 17).  He also testified at the hearing that on March 12, he had visited the Pleasant Hill Road location to meet with Barnes about purchasing a pit bull puppy and that while he was there, he did not purchase or receive any illegal drugs from anyone, including Barnes.  (Tr. at 286-89, 302-04, 314).  He stated that Detective George asked him to help by cooperating and purchasing a large quantity of cocaine from Barnes, but that he advised Detective George that Barnes "doesn't do nothing of that nature" and that he did not receive any cocaine from Barnes, nor did he get it from the Pleasant Hill location.  (Tr. at 300-01).  Instead, Spencer testified that he obtained the cocaine from a guy nicknamed "Skip" at another location, (Tr. at 313), but he admits that he told Detective George that he would "do what I have to do for my wife not to go to jail that day," (Tr. at 321).  He also testified that he had previously lived in a unit in Building E at Lakes Apartments, that he resided there in October, 2013, and that while he did not sell drugs from that apartment, he did have marijuana at that location.  (Tr. at 315-16).  Spencer further described alleged wrongdoings by Officer Viar during the traffic stop, including that Officer Viar allegedly placed him in a headlock, used racial slurs, threatened him, and discharged a firearm near his head, but he later told Detective George he did not want to pursue any charges against Officer Viar and he signed a written statement that he was "not going to press that issue any further."  (Tr. at 293-98, 318-20).  Officer Viar testified that during the March 12 traffic stop, he searched Spencer and discovered a firearm in his waistband, which accidentally discharged while Officer Viar was attempting to clear it, but it was not discharged near Spencer.  (Tr. at 99, 114, 291-93, 297-98, 311, 318, 324-25).

14

the garage door closing behind him, and after staying for approximately one hour, leaving to travel back toward DeKalb County.  [Doc. 25-1 at 4].  Detective George relayed that once Barnes was back inside DeKalb County, Officer Viar pulled his marked vehicle behind Barnes and observed him speeding at 50 miles per hour in a 40-mile per hour zone.  [Id.].  He described that Officer Viar initiated a traffic stop of Barnes' vehicle and during the course of the stop, Officer Viar discovered one kilogram of cocaine and a firearm that were "located in a clandestine compartment in the vehicle dashboard." [Id.].  Based on these facts, Detective George averred that he "believe[d] that there [was] probable cause to show that the DeKalb HIDTA Task Force ha[d] identified a midlevel drug distributor that [was] now operating in DeKalb County, Georgia," and that Barnes was "facilitating the illegal sale and distribution of cocaine . . . from the listed location and other locations[.]"  [Id.].[20]

## II. DISCUSSION

Barnes challenges the initial traffic stop on March 26, 2014, as not supported by reasonable suspicion or probable cause, and therefore, contends that all evidence arising therefrom is due to be suppressed.  [Doc. 81 at 4-19].  Barnes also asserts that

---

[20] DeKalb County Magistrate Judge Sabrina Scott issued the warrant, and it was marked that oral testimony was not considered.  [Doc. 25-1 at 5]; see also (Tr. at 178).  During the evidentiary hearing, Detective George admitted that he had not actually observed Barnes engage in any drug transactions, nor did he observe him with any narcotics or firearms during the surveillance operation.  (Tr. at 179-81).

even if the traffic stop was lawful, that it was unnecessarily prolonged and violated the Fourth Amendment both in its duration and scope, [id. at 19-25], and that he never in fact consented to the search of the vehicle, but that even if he did, it was not valid because it was the product of an illegal stop and not voluntary, [id. at 25-29]. Barnes also challenges the search of his girlfriend's residence, arguing that the statements made in regard to Spencer's arrest and the March 26, 2014, traffic stop of Barnes should be removed from consideration, and that once removed, the remaining information contained in the search warrant affidavit, including information from the confidential source, information related to other drug locations and heat checks, and statements involving time periods from October, 2013, and earlier, fails to establish probable cause.  [Doc. 82 at 1-24].  Finally, Barnes contends that the good faith exception does not apply in this case.  [Id. at 24-26].  The Court will address each of these arguments.

**A.    The March 26, 2014, Traffic Stop**

**1.    *Probable Cause to Initiate the Traffic Stop***

"The Fourth Amendment protects individuals from unreasonable search and seizure."  United States v. Rowls, 402 F. App'x 467, 468 (11th Cir. 2010) (per curiam) (unpublished) (citation and internal marks omitted).  The "[t]emporary detention of individuals during the stop of an automobile by the police, even if for only a brief

period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." <u>Whren v. United States</u>, 517 U.S. 806, 809-10 (1996) (citations omitted); <u>see also</u> <u>United States v. Purcell</u>, 236 F.3d 1274, 1277 (11th Cir. 2001); <u>United States v. Edenilson-Reyes</u>, Criminal Action File No. 1:09–CR–00361–RWS–AJB, 2010 WL 5620439, at *9 (N.D. Ga. Oct. 26, 2010), adopted by 2011 WL 195679, at *1 (N.D. Ga. Jan. 20, 2011).

A traffic stop is reasonable if the officer had probable cause to believe that a traffic violation has occurred, or if the traffic stop is justified by reasonable suspicion in compliance with <u>Terry v. Ohio</u>, 392 U.S. 1 (1968). <u>Edenilson-Reyes</u>, 2010 WL 5620439, at *9 (citing <u>United States v. Spoerke</u>, 568 F.3d 1236, 1248 (11th Cir. 2009); <u>Purcell</u>, 236 F.3d at 1277); <u>see also</u> <u>United States v. Monzon-Gomez</u>, 244 F. App'x 954, 959 (11th Cir. 2007) (per curiam) (unpublished); <u>United States v. Simmons</u>, 172 F.3d 775, 778 (11th Cir. 1999); <u>United States v. Sierra</u>, Cr. No. 2:10cr183–MEF, 2011 WL 1675217, at *2 (M.D. Ala. Apr. 19, 2011), adopted by 2011 WL 1675180, at *1 (M.D. Ala. May 4, 2011), <u>aff'd</u> by 501 F. App'x 900 (11th Cir. 2012) (per curiam) (unpublished). Thus, "[a] traffic stop . . . is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion. . . ."[21] <u>Edenilson-Reyes</u>, 2010 WL 5620439, at *9 (alterations in original)

---

[21] Probable cause must be supported by more than a mere suspicion, but does not require the same "'standard of conclusiveness and probability as the facts

(citations and internal marks omitted); <u>see also</u> <u>United States v. Boyd</u>, 388 F. App'x 943, 947 (11th Cir. 2010) (per curiam) (unpublished); <u>United States v. Woods</u>, 385 F. App'x 914, 915 (11th Cir. 2010) (per curiam) (unpublished).  The government bears the burden of presenting facts to establish that the traffic stop is supported by reasonable suspicion or probable cause.  <u>See</u> <u>Welsh v. Wisconsin</u>, 466 U.S. 740, 749-50 (1984); <u>see also</u> <u>United States v. Kelly</u>, No. 1:13–cr–108–WSD–JSA, 2014 WL 1153375, at *8 (N.D. Ga. Mar. 21, 2014), adopted at *4 (citation omitted) (citing <u>United States v. Tobin</u>, 923 F.2d 1506, 1517 n.21, 1520 (11th Cir. 1991) (en banc) (Clark, J., dissenting)).

An officer's subjective intentions and motives are irrelevant where the officer has probable cause for the stop.  <u>See</u> <u>United States v. Mwangi</u>, Criminal File No. 1:09-CR-107-TWT, 2010 WL 520793, at *3 n.9 (N.D. Ga. Feb. 5, 2010), adopted at *1 (citations omitted); <u>see also</u> <u>United States v. Arango</u>, 396 F. App'x 631, 632-33 (11th Cir. 2010) (per curiam) (unpublished) (citation and internal marks omitted) ("Where objectively reasonable conditions permit a stop, the officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior

---

necessary to support a conviction.'" <u>United States v. Dunn</u>, 345 F.3d 1285, 1290 (11th Cir. 2003) (quoting <u>Wood v. Kesler</u>, 323 F.3d 872, 878 (11th Cir. 2003)).  Reasonable suspicion is a less demanding standard than probable cause and requires only a fair probability that illegal activity has occurred.  <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989).

under the Fourth Amendment."); Miller v. Harget, 458 F.3d 1251, 1260 (11th Cir. 2006) (citations omitted) ("It is well-settled that an officer's subjective motivations do not affect whether probable cause existed"); United States v. Jimenez, No. 2:06-cr-74-FtM-29DNF, 2006 WL 2927477, at *2 (M.D. Fla. Oct. 11, 2006) (holding that "an officer's belief that he has probable cause or does not have probable cause is simply not a pertinent factor" in determining whether an arrest is lawful). That is, "if the driver of a car has broken a traffic law, no matter how relatively minor, a motion to suppress evidence cannot be based on the argument that the stop was pretextual." United States v. Wright, No. CR210-022, 2010 WL 4967468, at *1 (S.D. Ga. Nov. 5, 2010), adopted by 2010 WL 4967838, at *1 (S.D. Ga. Dec. 1, 2010) (citation omitted).

In addition, "[t]he propriety of the traffic stop . . . does not depend on whether the defendant is actually guilty of committing a traffic offense." United States v. Sicairos-Sicairos, Criminal Action File No. 4:10–CR–054–HLM, 2011 WL 2710031, at *5 (N.D. Ga. July 11, 2011) (citation omitted). "Instead, the relevant question is whether it was reasonable for the officer to believe that a traffic offense had been committed." Id. (citation omitted).

Barnes argues that the government has not met its burden of proving that the traffic stop was supported by probable cause because "(a) he was not speeding, (b)

[ ] the police did not have probable cause to stop him for speeding, and (c ) [ ] the use of 'pacing' allegedly used by the police . . . did not provide probable cause  for the police to stop him for speeding."  [Doc. 24 at 5 (footnote omitted)]; see also [Doc. 81 at 4-19].  Barnes also contends that there was no other lawful basis for the traffic stop and that the stop was therefore "an illegal and unconstitutional seizure and detention[.]"  [Doc. 24 at 6].

To support probable cause, the government relies on Officer Viar's testimony that he pulled in directly behind Barnes on Lilburn-Stone Mountain Road, followed him onto Old Stone Mountain Road, paced him with a factory-calibrated speedometer for more than a quarter of a mile, and based on his experience and training, determined that Barnes was driving 50 miles per hour, which fluctuated at times up to about 52 miles per hour, in a 40-mile per hour zone and was therefore speeding.  See (Tr. at 34-37, 39-43, 60-64, 75-77, 94, 96, 119-21, 339, 341-44, 369). Barnes challenges Officer Viar's credibility, relying on his own testimony that he was not speeding but was in fact driving cautiously because he knew an officer was behind him, see (Tr. at 345, 371-72), and on Canupp's testimony that Old Stone Mountain Road was not a suitable roadway to employ the pacing technique, see (Tr. at 219-24, 242, 246-48; Def. Ex. 14), as well as arguing that the officers' plan on March

26, 2014, was to stop Barnes and search his vehicle "regardless," [Doc. 81 at 5-6], and

that Officer Viar had engaged in previous misconduct in other cases, [id. at 17-18].

"The Fourth Amendment plainly does not prohibit a law enforcement officer

from pulling over a motorist for suspected speeding whenever the officer is acting

solely on the basis of his visual observation." Monzon-Gomez, 244 F. App'x at 959.

That is, "the Fourth Amendment does not require the use of radar detection to

establish probable cause to believe a motorist is speeding." Id. (footnote omitted).

Officer Viar's testimony at the hearing demonstrates that he initiated a traffic stop

of Barnes' vehicle after he estimated the speed in which it was traveling as being

over the speed limit for that particular roadway based on his pacing of Barnes'

vehicle with his own, and the "Eleventh Circuit has concluded that an officer has

probable cause to stop a vehicle for speeding based on pacing," United States v.

Berkley, No. 1:13–cr–157–WSD–01, 2013 WL 6858920, at *3 (N.D. Ga. Dec. 30, 2013)

(citing Rowls, 402 F. App'x at 468-69).  Thus, it was reasonable for Officer Viar to

believe that a traffic offense had been committed since he had actually observed and

determined that Barnes' speed exceeded the posted speed limit for that particular

roadway.    See  United  States  v.  Griffin,  Criminal  Action  File  No.

2:10–CR–016–RWS–SSC, 2010 WL 6815894, at *5 (N.D. Ga. Sept. 8, 2010), adopted by

2011 WL 2518808, at *1 (N.D. Ga. June 24, 2011) (finding officer's testimony that

defendant's vehicle "was driving in excess of the speed limit[ ]" was credible "based on [the officer's] observation that the [vehicle] was passing by other vehicles, his experience and training in visual estimations of speed, and his observation of the [vehicle's] speed while he 'paced' it by traveling behind it").

Although Barnes denies that he was speeding and in fact, offered testimony that he was actually traveling less than 40 miles per hour, see (Tr. at 371), he also testified that Officer Viar was directly behind him for approximately one mile and that he only "glanced at the speed a few times, but not to the point where [he] couldn't pay attention of what was in front of [him]," (Tr. at 369, 371); see also (Tr. at 372 (Barnes' testimony that he "couldn't spend too much time glancing on [the speedometer] because at the same time [he] had cars in front of [him]")).  Thus, Barnes did not credibly contradict Officer Viar's testimony that he was speeding for at least one quarter of a mile, which is the minimum distance required for pacing, because Barnes could not state with certainty what his speed was the entire time he was driving while Officer Viar followed him.

Barnes also challenges Officer Viar's testimony based on Canupp's expert testimony that Old Stone Mountain Road was not an "optimal" roadway on which to conduct pacing, see (Tr. at 218-24, 238-40, 242, 246-48); however, Canupp also testified that he did not actually attempt to pace a vehicle on that road and that he

was not certain whether there was a quarter mile stretch on the road where a

constant speed could be maintained since he could not maintain his speed on that

roadway, (Tr. at 236, 241-42, 249, 252-53).[22]  Although Canupp's testimony may call

into question whether the entirety of Old Stone Mountain Road was suitable for

pacing, his testimony was not conclusive as to whether a vehicle could in fact be

paced on at least a quarter of a mile section of the road since he did not attempt to

pace a vehicle on that road or determine whether there was a quarter of a mile

portion of the road suitable for pacing.[23]  Thus, Barnes has not presented sufficient

evidence to contradict Officer Viar's testimony that he paced Barnes' vehicle for a

---

[22] Officer Viar testified that his speed fluctuated as he followed Barnes, going up to about 52 miles per hour at times, but it never fell below 50 miles per hour.  (Tr. at 41, 76).

[23] Barnes argues that it is irrelevant whether a vehicle could be paced for a quarter of a mile on Old Stone Mountain Road since Officer Viar testified that he paced Barnes' vehicle for "[a]bout a half a mile to a mile," (Tr. at 41), which Barnes maintains is not credible given Canupp's testimony.  [Doc. 81 at 12-14].  However, as discussed, Canupp's testimony was not dispositive as to whether pacing could be performed on at least a portion of Old Stone Mountain Road where Officer Viar followed Barnes, even if the conditions were not optimal.  Moreover, both Canupp and Officer Viar testified that only a quarter of a mile was required for pacing, (Tr. at 40, 218), so even if it were shown that Officer Viar could not have properly paced Barnes' vehicle for half of a mile, this variation may raise a reasonable doubt as to whether Barnes was actually guilty of speeding, but it does not preclude finding probable cause sufficient to support the stop.  See United States v. Grant, No. CR408–368, 2009 WL 3254353, at *4 n.5 (S.D. Ga. Oct. 7, 2009), adopted at *1.

distance sufficient to determine that he was driving in excess of the posted speed limit, and the Court finds Officer Viar's testimony on this point credible.[24]

_____

[24] Barnes' arguments related to his assertion that law enforcement were merely interested in searching his vehicle in order to search for drugs and were going to do so with or without probable cause ignores Sergeant Pitts' credible testimony that if no probable cause existed for a traffic stop, the stop would not occur, as well as Officer Viar's testimony that he had been involved in situations where he was unable to develop probable cause for a traffic stop and that he had to let the suspect continue on without stopping him or her in those instances. See (Tr. at 37, 258-60, 265-67). Moreover, it is well-established that an officer's subjective reasons for a stop are irrelevant as long as the officer had probable cause to stop the vehicle. See United States v. Peguero, 518 F. App'x 792, 794 (11th Cir. 2013) (per curiam) (unpublished) (citation omitted). Indeed, "under Whren, once [Officer Viar] witnessed a violation of the state's traffic laws, [his] stop of [Barnes'] vehicle was appropriate regardless of any 'pretextual' motivations." United States v. Crump, Criminal Action File No. 4:10–CR–032–HLM–WEJ, 2011 WL 6153106, at *5 (N.D. Ga. Nov. 21, 2011), adopted by 2011 WL 6179211, at *8 (N.D. Ga. Dec. 12, 2011) (citation omitted); see also United States v. Johnson, No. CR407-164, 2007 WL 2874303, at *3 (S.D. Ga. Sept. 26, 2007), adopted at *1 (citation omitted) ("The stop of defendant's vehicle to enforce the Georgia traffic laws was entirely proper, and the fact that the officer had another reason for the stop . . . is simply irrelevant to the Fourth Amendment inquiry."). Additionally, despite Barnes' attempt to impeach Officer Viar's credibility by introducing an excerpt of a transcript of his testimony from an unrelated case in which he admitted that he had been previously disciplined for his conduct during a search of a residence, Officer Viar explained that he was disciplined for using inappropriate language, see (Tr. at 105, 107-08, 110-12; Def. Ex. 2), and the court in that case found that Officer Viar's previous disciplinary history did not undermine his testimony, see Berkley, 2013 WL 6858920, at *1-5. Furthermore, while Barnes also offers Spencer's testimony concerning Officer Viar's conduct during his traffic stop in an effort to challenge his credibility, Spencer admitted that Barnes was like a brother to him and that he would do anything for him within his means, including coming to court and risking incriminating himself. (Tr. at 325). Considering the witnesses' testimony at the evidentiary hearing, their demeanor on the stand, and their respective interests in the outcome of the suppression motion, the Court finds Officer Viar's testimony to be more credible than Barnes or Spencer. See United States v. Young, No. 2:08-cr-42-FtM-29SPC, 2008

In short, Officer Viar's testimony established that he had probable cause to believe that Barnes had violated Georgia law, which is "all that is necessary to conduct a traffic stop." United States v. Alvardo, No. 8:10-CR-348-T-30TGW, 2010 WL 5262736, at *5 (M.D. Fla. Nov. 17, 2010), adopted by 2010 WL 5262735, at *1 (M.D. Fla. Dec. 17, 2010) (citation omitted).   Having considered the evidence and testimony presented at the evidentiary hearing, the Court finds Officer Viar provided credible testimony that he paced Barnes' vehicle as he followed it on Old Stone Mountain Road and believed that he was speeding.   See United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations are "within the province of the factfinder").   Therefore, Officer Viar had probable cause to stop Barnes for speeding.

**2.      *Scope and Duration of the Traffic Stop***

Barnes next contends that Officer Viar unreasonably extended the traffic stop. [Doc. 24 at 6-7; Doc. 81 at 19-25].   Specifically, Barnes asserts that Officer Viar "not only detoured from the mission of the traffic stop, [but] he completely abandoned it" and "directed the entirety of his energies and attentions [sic] to the investigation of independent criminal activity," in violation of his Fourth Amendment rights. [Doc. 81 at 19].   In this respect, Barnes argues that "[o]nce Officer Viar knew that

---

WL 4790390, at *7 (M.D. Fla. Oct. 30, 2008).

[Barnes] was legally-authorized to operate the vehicle that he was driving, he should have written [him] a ticket or a warning for speeding and concluded the stop," but "[h]e did not write [him] a ticket for speeding" or a "warning for speeding" and instead, "Officer Viar abandoned his speeding investigation and began asking [him] about his probation status," which "had nothing to do with the 'mission' of the traffic stop" and therefore unnecessarily prolonged his detention.  [Id. at 22-23 (citations omitted)].

"[A]n officer's actions during a traffic stop must be reasonably related in scope to the circumstances which justified the interference in the first place, and the stop may not last any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity."  United States v. Garcia, 284 F. App'x 791, 794 (11th Cir. 2008) (per curiam) (unpublished) (alteration in original) (citation and internal marks omitted).  "[A]n officer may prolong the stop to investigate the driver's license and the vehicle registration and to perform a computer check."  Edenilson-Reyes, 2010 WL 5620439, at *10 (citation omitted). "The officer can lawfully ask questions, even questions not strictly related to the traffic stop, while waiting for a computer check of registration or examining a driver's license so long as it does not prolong beyond the time reasonably required to complete that mission."  United States v. Cantu, 227 F. App'x 783, 785 (11th Cir.

2007) (per curiam) (unpublished) (citation and internal marks omitted). "Ordinarily, when a citation or warning has been issued and all record checks have been completed and come back clean, the legitimate investigative purpose of the traffic stop is fulfilled." Edenilson-Reyes, 2010 WL 5620439, at *10  (citation and internal marks omitted).

"However, a traffic stop may last longer than the purpose of the stop would ordinarily permit if an officer, based on specific facts and rational inferences drawn from those facts in light of his training and experience, has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring." United States v. DeJesus, 435 F. App'x 895, 900 (11th Cir. 2011) (per curiam) (unpublished) (citations omitted).  That is, "[a]n investigative stop can grow out of a traffic stop so long as the officer has reasonable suspicion of criminal activity to expand his investigation, even if his suspicions were unrelated to the traffic offense that served as the basis of the stop." United States v. Gomez Serena, 368 F.3d 1037, 1041 (8th Cir. 2004) (citation omitted).  As the Supreme Court recently held, "[a] seizure justified only by a police-observed traffic violation . . . become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation," absent either reasonable suspicion or consent. Rodriguez

v. United States, 135 S. Ct. 1609, 1612-13 (2015) (all but first alteration in original)

(citation and internal marks omitted).[25]

_____

[25] In Rodriguez, the Supreme Court likened a traffic stop to a Terry stop, noting that the duration of the stop "is determined by the seizure's mission," such as addressing the traffic violation and related safety concerns, including "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance," and it considered whether a traffic stop could be extended to permit a dog sniff, which it noted was "a measure aimed at detect[ing] evidence of ordinary criminal wrongdoing" and "not an ordinary incident of a traffic stop." 135 S. Ct. at 1614-15 (alteration in original) (citations and internal marks omitted). In Rodriguez, the defendant was stopped for a traffic violation. Id. at 1612. The officer approached the vehicle, asked the defendant some questions, and requested his driver's license, registration, and proof of insurance. Id. at 1612-13. The officer ran a records check on the defendant, which came back clean, and then he asked the defendant and his passenger some travel-related questions. Id. at 1613. After the suspects answered the questions, the officer issued the defendant a written warning for the traffic violation, thereby concluding the purpose of the stop, but the officer testified at the hearing that the suspects were not free to leave at that point because he wanted to conduct a dog sniff of the vehicle but had to wait for another officer to arrive on the scene. Id. Approximately seven or eight minutes passed before the second officer arrived, and the officer conducting the stop then walked his dog around the vehicle and it alerted to the presence of drugs. Id. In deciding the reasonableness of the seizure at issue, the Supreme Court noted that the "critical question [was] not whether the dog sniff occur[red] before or after the officer issue[d] a ticket . . ., but whether conducting the sniff prolong[ed]– i.e., add[ed] time to– the stop." Id. at 1616 (citation and internal marks omitted). The Supreme Court held that "absent the reasonable suspicion ordinarily demanded to justify detaining an individual," an officer may not conduct "unrelated checks," such as a dog sniff, during an otherwise lawful traffic stop in a way that prolongs the stop beyond the time reasonably required to complete the goal of the traffic stop. Id. at 1615. Although the district court found that the dog sniff was not supported by reasonable suspicion, the Court of Appeals did not review that determination, and the Supreme Court therefore found that the issue remained open for the Eighth Circuit to decide on remand. Id. at 1616-17.

Officer Viar testified that after he approached Barnes from the driver's side of the vehicle and observed him fumbling in the center console, he explained to Barnes the reason for the stop and asked him to exit his vehicle and to provide his license and registration.[26]   (Tr. at 43-46, 86-87, 91, 115, 345, 372).   Officer Viar returned to his patrol vehicle and ran the information through his computer system and learned that while Barnes had a valid license, he was on probation.  (Tr. at 46, 87).  He returned to where Barnes was standing and immediately asked him why he was on probation, and Barnes responded that he had a previous drug problem.  (Tr. at 46, 89, 345).  Officer Viar and Barnes both testified that Officer Viar asked Barnes whether he had any drugs in his vehicle, to which Barnes testified that he responded, "No, not to my knowledge."  (Tr. at 46-47, 96-97, 347, 373-74).  Officer Viar testified that he then asked Barnes for consent to search his vehicle and that Barnes consented without any hesitation.  (Tr. at 46-47, 96-97).  Barnes, however, testified that Officer Viar never asked him for consent to search the vehicle, but that he just started walking his dog around Barnes' vehicle.  (Tr. at 347, 373-74).  Officer

---

[26] When officers are conducting a valid traffic stop, they may lawfully order the suspect to exit the vehicle.  Maryland v. Wilson, 519 U.S. 408, 414-15 (1997); Pennsylvania v. Mimms, 434 U.S. 106, 110-11 & n.6 (1977) (per curiam) (holding that concern for a police officer's safety outweighed the slight intrusion on a motorist's liberty when the police officer, who had no reason to believe the motorist was armed or dangerous, directed the motorist stopped for a minor traffic infraction to step out of his vehicle); see also United States v. Swann, No. 4:14–mj–0102–MSH, 2014 WL 6605610, at *3 (M.D. Ga. Nov. 20, 2014).

Viar testified that after obtaining consent to search the vehicle for drugs, he deployed Basa and conducted a dog sniff of Barnes' vehicle, which resulted in Basa alerting to the presence of the odor of narcotics "at the center of the driver and passenger door area." (Tr. at 47-48, 373).

Barnes relies on <u>Rodriguez</u> in support of his argument that Officer Viar unlawfully extended the duration and scope of the traffic stop by asking him about his probation and conducting a dog sniff, <u>see</u> [Doc. 81 at 20-22], and the government's contention that the dog sniff did not prolong the stop in this case is not persuasive since Officer Viar testified that from the point he asked Barnes about his probation, his efforts were directed toward searching the vehicle, (Tr. at 89), which was not necessary for completing the mission of the traffic stop.[27] <u>Cf.</u> <u>United States v. Baker</u>, No. 2:14–cr–128–FtM–29DNF, 2015 WL 3605039, at *10 (M.D. Fla. June 8, 2015), adopted at *1 (finding a dog sniff did not prolong the traffic stop contrary to <u>Rodriguez</u> where one officer conducted a dog sniff while second officer was completing the traffic stop). However, the government maintains that Barnes consented to the search of his vehicle and that "his consent renders the Court's reasoning in <u>Rodriguez</u> inapplicable." [Doc. 85 at 5]. The Court agrees, and finds

---

[27] The government has not argued that Officer Viar had reasonable suspicion that Barnes was engaged in illegal activity as an alternative basis for the duration of the stop, and the Court therefore does not reach this issue.

Officer Viar's testimony on this point credible.  See United States v. $167,070.00 in U.S. Currency, No. 3:13-CV-00324-LRH, 2015 WL 3658069, at *8 (D. Nev. June 12, 2015) (noting that the search in Rodriguez occurred after the driver refused to consent to a dog sniff).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable  . . . subject only to a few specifically established and well-delineated exceptions.'"  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 454-455 (1971); Katz v. United States, 389 U.S. 347, 357 (1967)).  "One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent."  United States v. Garcia,  890 F.2d 355, 360 (11th Cir. 1989).

"In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice."  Id.  "[T]he principles for determining the voluntariness of consent for a search are the same as those for determining the voluntariness of a confession– i.e. whether consent is voluntary turns on questions of fact, determinable from the totality of the circumstances."

United States v. Boskic, Criminal No. 04-10298-DPW, 2006 WL 1540488, at *19 (D. Mass. June 2, 2006) (citation and internal marks omitted); see also United States v. Tovar-Rico, 61 F.3d 1529, 1535 (11th Cir. 1995) (noting voluntariness of consent is judged in light of the totality of the circumstances).  Ultimately, the burden is on the government to prove that the consent was given voluntarily.  United States v. Bentley, 151 F. App'x 824, 827 (11th Cir. 2005) (per curiam) (unpublished) (quoting United States v. Chemaly, 741 F.2d 1346, 1352 (11th Cir. 1984)); Tovar-Rico, 61 F.3d at 1536 (quoting Florida v. Royer, 460 U.S. 491, 497 (1983)); United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989).

Officer Viar credibly testified on direct and cross-examination that Barnes voluntarily consented to the search of his vehicle. (Tr. at 46-47, 96-97).  It is undisputed that Officer Viar asked Barnes if there were any drugs in the vehicle after Barnes said that he was on probation for a drug offense, and Barnes responded, "No, not to my knowledge."  (Tr. at 347, 373-74).  Officer Viar testified that he then asked Barnes for consent to search the vehicle for drugs, and that Barnes consented without any hesitation.  (Tr. at 46-47, 96-97).  Officer Viar's testimony was also consistent with his incident report, in which he stated that he asked Barnes "if [he] could search the vehicle for drugs and [Barnes] stated 'Yes.'"  (Gov. Ex. 20).  According to Officer Viar, he used a casual, conversational tone, did not draw his

weapon, and had not touched or restrained Barnes in any way, but simply asked

Barnes if he could search his vehicle, consistent with his standard practice,[28] and

Barnes orally consented.  (Tr. at 47, 96).[29]

Barnes attempts to discredit Officer Viar's testimony by denying that Officer

Viar asked him for consent.  See (Tr. at 347).  However, after considering all of the

testimony, as well as the demeanor and interests of the witnesses, the Court finds

the testimony of Officer Viar to be credible.  See Pineiro, 389 F.3d at 1366

(recognizing that credibility determinations are within the province of the

_____

   [28] Officer Viar, an experienced narcotics officer who was responsible for initiating traffic stops, performing highway interdiction, and assisting detectives in their cases, testified that the "standard phrase" he always uses when seeking consent to search in such circumstances is, "Can I search your car?," (Tr. at 96), and under the circumstances of this case, Barnes' contention that Officer Viar did not ask for consent to search his vehicle is simply not credible since Barnes was the subject of surveillance by narcotics detectives who suspected he was engaged in drug trafficking, (Tr. at 34, 257).

   [29] The fact that the officers did not inform Barnes of his right to refuse consent is not dispositive.  See United States v. Zapata, 180 F.3d 1237, 1242 (11th Cir. 1999) (holding consent voluntary despite fact that officer failed to inform defendant of right to refuse consent); see also Bentley, 151 F. App'x at 828 (noting knowledge of right to refuse consent is only one factor to be taken into account, and the government "need not establish such knowledge as the *sine qua non* of an effective consent").  And, Officer Viar's failure to have Barnes sign a consent form also does not render the search involuntary.  See United States v. Smith, 199 F. App'x 759, 761, 763 (11th Cir. 2006) (per curiam) (unpublished) (finding oral consent voluntary where defendant did not sign consent to search form).  In fact, Barnes' only argues that his alleged consent was not voluntary because it resulted from an illegal traffic stop, see [Doc. 24 at 9]; however, having found the traffic stop lawful, this argument is without merit.

factfinder).  "In making its credibility determination[s], the Court must take into consideration not only the interests of the witness[es], but also 'the internal consistency of the [witnesses'] testimony, or [their] candor or demeanor on the stand.'"  United States v. Tyler, No. CR 106-075, 2006 WL 2094538, at *7 (S.D. Ga. July 26, 2006) (quoting United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002)).  Here, aside from simply denying that Officer Viar asked him for consent, Barnes has failed to persuasively contest Officer Viar's credibility on this point.[30] Because Officer Viar testified in a credible manner that the vehicle was searched only after obtaining Barnes' consent, the Court credits his testimony over that of Barnes.[31]  Accordingly, Barnes voluntarily consented to the extension of the lawful traffic stop to allow Officer Viar to search the vehicle for drugs, and since the March 26, 2014, traffic stop and subsequent detention and search were lawful, it is

---

[30] Although it appears that Sergeant Cusamano was present and standing near Barnes at the time Officer Viar requested consent, see (Tr. at 47, 97), neither party called Sergeant Cusamano to testify at the evidentiary hearing.

[31] Indeed, the Court notes that Barnes was not a disinterested witness.  As the defendant, Barnes "has a strong interest in the outcome of this case."  United States v. Smalls, 617 F. Supp. 2d 1240, 1251 (S.D. Fla. 2008), adopted at 1243.  Barnes' motive undermines his credibility, and having reviewed the testimony at the hearing, and observed the demeanor of the witnesses, and considered the interests of the witnesses, the Court concludes that Barnes' testimony is simply not credible. Tyler, 2006 WL 2094538, at *8.

**RECOMMENDED** that Barnes' motion to suppress evidence arising from the traffic

stop, [Doc. 24], be **DENIED**.

**B.    The March 26, 2014, Search of the Residence**

Barnes argues that the search warrant for his girlfriend's residence was invalid

because the affidavit upon which it was obtained contained false and misleading

statements and material omissions; contained statements related to an illegal stop,

search, and seizure; failed to corroborate the confidential source of information; and

was based on stale information, and he asserts that the good faith exception is

inapplicable.  [Docs. 25 & 82].  The Court will address each of these arguments in

turn.

**1.    *Legal Standard for Sufficiency of Search Warrant***

The Eleventh Circuit has explained the Court's review of the sufficiency of a

search warrant as follows:

> When called upon by law enforcement officials to determine the
> legitimacy of search warrants and their supporting affidavits, issuing
> magistrates and reviewing courts alike must strike a delicate balance
> between constitutional guarantees against excessive intrusions into
> areas of individual freedom and the Government's need to access and
> to secure relevant evidence in criminal prosecutions.  In particular,
> issuing magistrates are given the unenviable task of making "firing
> line" decisions that attempt to encourage availment of the warrant
> process while simultaneously striving to protect citizens from
> unwarranted governmental interference.   In recognition of the
> difficulty inherent in discharging this responsibility, reviewing courts

lend substantial deference to an issuing magistrate's probable cause determinations.

United States v. Miller, 24 F.3d 1357, 1363 (11th Cir. 1994). "The Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence exists at the place for which the warrant is requested." United States v. Betancourt, 734 F.2d 750, 754 (11th Cir. 1984) (citing Zurcher v. Stanford Daily, 436 U.S. 547, 558 (1978)); see also United States v. Cadet, Criminal Action Nos. 1:11–CR–00522–WBH–LTW, 1:11–CR–00113–WBH–LTW, 2013 WL 504892, at *4 (N.D. Ga. Jan. 16, 2013), adopted by 2013 WL 504815, at *1 (N.D. Ga. Feb. 8, 2013), aff'd by, 574 F. App'x 917 (11th Cir. 2014) (per curiam) (unpublished). "Probable cause deals 'with probabilities [which are] . . . the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Illinois v. Gates, 462 U.S. 213, 241 (1983) (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)); see also United States v. Spann, No. 15–20070, 2015 WL 1969111, at *3 (S.D. Fla. May 1, 2015).

"Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner." Miller, 24 F.3d at 1361 (citation omitted). Instead, "a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations."

Id. (citations omitted); see also United States v. McCullough, Criminal Indictment
No. 1:11–CR–136–JEC/AJB–01, 2012 WL 11799871, at *13 (N.D. Ga. Oct. 9, 2012),
adopted by 2014 WL 3955556, at *2 (N.D. Ga. Aug. 13, 2014). Furthermore, "[t]he
fact than an innocent explanation may be consistent with the facts alleged . . . does
not negate probable cause." United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985)
(citations omitted); see also Adams v. Williams, 407 U.S. 143, 149 (1972) (citation
omitted).

### 2.   *Legal Analysis*

#### a.   **Detective George's Affidavit**

It is undisputed that, on its face, the affidavit establishes probable cause to
believe that evidence of a crime would be found at the residence in question,
see (Gov. Ex. 19); [Docs. 25 & 82]. Rather, the issue is whether the search warrant
contains false statements, misrepresentations, or material omissions which should
be set aside under Franks v. Delaware, 438 U.S. 154 (1978), that would render the
remaining portions of the search warrant affidavit insufficient to establish probable
cause. See [Doc. 25 at 10-11, 16 & Doc. 82].

"To void a search warrant, a defendant must show by a preponderance of
evidence that (1) the affiant included in the warrant affidavit a false statement
knowingly and intentionally, or with reckless disregard for the truth, and (2) the

affidavit's remaining content is insufficient to establish probable cause." United States v. Herron, No. 2:14–cr–23–FtM–38DNF, 2015 WL 867309, at *15 (M.D. Fla. Feb. 4, 2015) (citations and internal marks omitted).  Negligent or innocent mistakes in a warrant application do not violate a defendant's Fourth Amendment rights.  See Franks, 438 U.S. at 171; Maughon v. Bibb Cnty., 160 F.3d 658, 660 (11th Cir. 1998) (per curiam); Madiwale v. Savaiko, 117 F.3d 1321, 1326-27 (11th Cir. 1997). Moreover, "'[i]nsignificant and immaterial misrepresentation[s] or omissions will not invalidate a warrant.'" United States v. Maharaj, No. 07-80024-CR-CR, 2007 WL 2254559, at *7 (S.D. Fla. Aug. 2, 2007) (quoting United States v. Ofshe, 817 F.2d 1508, 1513 (11th Cir. 1987)).  Not every fact recited in an affidavit in support of an application for a search warrant must be exactly correct, but the affidavit must be truthful in the sense that it is believed or appropriately accepted by the affiant as true.  See Franks, 438 U.S. at 165 (explaining that "probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily").  However, "[i]ntentional or reckless false statements or omissions will invalidate a warrant if the true and complete facts would have negated a finding of probable cause." Herron, 2015 WL 867309, at *15 (citation omitted).

"[T]he defendant also bears the burden of showing that absent [the alleged] misrepresentations or omissions, probable cause would have been lacking." Maharaj, 2007 WL 2254559, at *6 (citing United States v. Novaton, 271 F.3d 968, 987 (11th Cir. 2001)).  Upon such proof by the defendant, the Court must suppress the items seized pursuant to the defective search warrant.  See United States v. Weber, 808 F.2d 1422, 1424 (11th Cir. 1987) (per curiam); United States v. Kirk, 781 F.2d 1498, 1502 (11th Cir. 1986).  However, "if the court is satisfied that when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, then no hearing is required."  United States v. Nakouzi, No. 3:05CR154(MRK), 2005 WL 3211208, at *5 (D. Conn. Nov. 30, 2005) (internal citation and marks omitted).

Barnes challenges two specific events relayed in Detective George's affidavit in support of the search warrant for the residence, claiming that statements in relation to these events are either false or misleading, or were obtained as a result of an illegal stop, search, and seizure, and that without them, probable cause to search the residence does not exist.  See [Doc. 82 at 2-11].  First, Barnes challenges the information related to the stop and arrest of Spencer in the affidavit as follows:

> During the second week of March 2014, Your Affiant and the DeKalb [HIDTA] Task Force conducted a surveillance operation at 8312 Pleasant Hill Rd . . . . Upon our arrival we observed Barnes' vehicle (red Cadillac) parked in the driveway of the location.  Upon Barnes leaving

39

8312 Pleasant Hill Rd mobile surveillance was established and maintained as he travelled directly back to the listed location. Barnes was at the listed location approximately fifteen minutes before he left and parked at a nearby plaza. On previous surveillance operations Your Affiant has observed Barnes go into this plaza and perform "heat checks" to see if he can observe any vehicles that may be following him. Upon Barnes entering the plaza mobile surveillance was set up on the streets surrounding the plaza. When Barnes left the plaza mobile surveillance was maintain[ed] as Barnes travelled directly back to the 8312 Pleasant Hill location. Detectives observed Barnes park at the location and then observed a gold Buick LeSabre pull in behind Barnes['] vehicle. The driver of the vehicle, later identified as [] Spencer, exited the Buick LeSabre and went inside of the location leaving a female in the passenger seat.

Approximately ten minutes later Spencer exited the location, walked back to the car and left the location traveling westbound on Pleasant Hill Rd. Mobile surveillance was maintained on the vehicle. The vehicle was traveling on Redan Rd when it failed to use a turn signal while turning onto Martin Rd. K-9 Detective Huckabey performed a traffic stop on the vehicle. Upon further investigation Spencer was found in possession of 187.1 grams of cocaine and a concealed hand gun. Spencer was subsequently arrested and charged with trafficking cocaine, giving a false name and possession of a hand gun during VGCSA.

Approximately two hours after the traffic stop Barnes left the Pleasant Hill Location and returned to the listed location later that evening.

[Doc. 25-1 at 4 (all caps omitted)].

Barnes contends that the Court should strike this portion of the affidavit because the "clear purpose behind this passage [was] to convey to the state magistrate judge who was considering whether probable cause existed that a drug deal had taken place and that [he] and [Spencer] were participants in that illegal

transaction," but that Spencer directly contradicted this suggestion with a sworn declaration, as well as his testimony at the evidentiary hearing, stating that he advised the officers at the scene that Barnes was not involved in drug activity. [Doc. 82 at 2]. In particular, Barnes asserts that Spencer advised the officers at the time of his arrest that he did not receive any illegal narcotics from Barnes or from the Pleasant Hill location, and that when the officers asked him if he would cooperate, Spencer told them that Barnes did not sell drugs, but that Detective George "never told the state magistrate judge any of these facts regarding [Spencer] and his having specifically denied that [Barnes] had any involvement with the cocaine found in [Spencer's] possession on March 12, [2014,] or that the cocaine had come from the Pleasant Hill Road address." [Id. at 3-5 (citation omitted); Doc. 25-1 at 11-12 ¶¶ 4-5]; see also (Tr. at 286-89, 300-04, 306, 308, 314, 336-37; Def. Ex. 17). Barnes maintains that "had the police included the information provided by [Spencer], the state magistrate judge would have seen readily that [Spencer's] arrest for drugs was not part of any probable cause analysis as it related to [Barnes] or the house." [Doc. 82 at 5 (citations omitted)].[32]

---

[32] It is undisputed that the affidavit does not contain any false statements regarding what officers observed with respect to the events leading up to Spencer's arrest. In fact, the affidavit does not include any information about Spencer's alleged statements at the scene of his arrest, but rather, it merely recites the observations of the officers that day. See [Doc. 25-1 at 4]. However, Barnes complains that the implication from the facts detailing what the officers observed

Detective George, however, testified that while Spencer stated he did not receive any cocaine from Barnes, he also explained that he had given money to Barnes, who, acting as a middleman, then gave it to another individual in return for drugs that Barnes then provided to Spencer.  (Tr. at 204-05, 212).  He also stated that Spencer told him that he and Barnes would also sell drugs on occasion out of Spencer's apartment and that he would do anything to help his wife, who was a passenger in the car at the time of his arrest, in reference to cooperating against Barnes and another individual.  (Tr. at 205-06, 212).[33]

Barnes' argument has merit only if the Court credits Spencer's version of events over that of Detective George.  In other words, the Court must find that Spencer in fact made the statements he claims to have made exonerating Barnes, and that Detective George testified falsely about what Spencer said following his arrest for possession of a firearm and cocaine.  Thus, the Court "must judge the credibility of the witnesses," and here, it "credits the testimony of the law enforcement [officer] about what really did occur[.]"  United States v. Pineda, Criminal Case No.

_____

is that Spencer and Barnes engaged in a drug transaction, and Barnes asserts that had Spencer's version of the statement he made following his arrest indicating that Barnes did not provide him with any drugs been included in the affidavit, it would have negated any such implication.

[33] Spencer admits that he told Detective George that he would "do what I have to do for my wife not to go to jail that day."  (Tr. at 321).

1:11–CR–00006–CAP–JFK, 2012 WL 2906758, at *28 (N.D. Ga. June 4, 2012), adopted by 2012 WL 2907447, at *1 (N.D. Ga. July 16, 2012).  "In weighing the credibility of a witness, the court takes into account the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand."  Id., at *29 (citation and internal marks omitted).

Spencer, a convicted felon, who acknowledged on cross-examination that he told Detective George that he would "do what [he had] to do for [his] wife not to go to jail," (Tr. at 321), also testified that Barnes was like a brother to him and that he would do anything for him within his means, including coming to court and risking incriminating himself.  (Tr. at 325-27, 329).  Spencer's admissions demonstrate his bias for Barnes and a desire to protect those he regards as family, and his expressed willingness to "do anything" for such persons, even going to jail for them, and to "watch each other['s] back," (Tr. at 326), when both he and Barnes were arrested under similar circumstances in possession of a firearm and cocaine, does not inspire confidence in the Court that Spencer provided entirely truthful testimony.[34] Moreover, Spencer's statements that Barnes was not involved with illegal drugs or anything "of that nature," (Tr. at 300); see also [Doc. 25-1 at 11 ¶ 5], is belied by the

_____

[34] Spencer was not clear and forthcoming about several matters during his testimony, see (Tr. at 306-10, 313-14, 316-17, 334-36), and even acknowledged that his sworn statement included inaccurate information, (Tr. at 323, 334-36), which further undermines his credibility and reliability as a witness.

fact that Barnes was lawfully arrested on March 26, 2014, with a kilogram of cocaine. Thus, the Court finds Detective George to be more credible than Spencer with respect to what Spencer said after his arrest and therefore rejects Barnes' contention that Detective George mislead the magistrate by failing to include Spencer's alleged statements in the affidavit.[35]

Barnes also argues that the "portion of the search warrant affidavit that relates to the search and arrest . . . on March 26, 2014 should be stricken from the affidavit because it comprises information that was obtained as a result of an illegal stop, search, and seizure." [Doc. 82 at 10]. However, since the discussion of the motion to suppress evidence obtained following the traffic stop demonstrates that the March 26, 2014, stop, search, and seizure were lawful, Barnes' request to strike the portion of the affidavit related to that traffic stop is due to be denied. See United States v. Latimore, Criminal Action File No. 1:13–cr–287–TCB, 2014 WL 3109183, at *27 (N.D. Ga. July 7, 2014), adopted at *1.[36] Thus, contrary to Barnes' assertions, the Court

---

[35] Furthermore, even assuming that the omission of Spencer's alleged statements rendered that portion of the affidavit false or misleading, and striking that portion of the affidavit pursuant to Franks, there was still probable cause to issue the search warrant based on the other observations of law enforcement that had occurred from July, 2013, up to Barnes' arrest in March, 2014.

[36] Barnes argues that once the information related to Spencer and the March 26, 2014, traffic stop was removed, "the remaining allegations in the search warrant affidavit are insufficient to establish probable cause." [Doc. 82 at 11]. Because the Court rejects Barnes' request to excise those portions from the search warrant

finds that the search warrant affidavit did not contain material omissions or false

and misleading representations, and that it established probable cause to search the

residence in question.

―――――――――――

affidavit, probable cause to search the residence in question has been established. Nevertheless, Barnes makes several other arguments concerning the affidavit, which the Court will briefly address. Barnes first argues that the affidavit failed to demonstrate the confidential source's veracity, see [id. at 12-17]; however, even were the statement attributable to the confidential source excised from the affidavit, the remaining information would still support a finding of probable cause. And, while Barnes notes that the police "never saw [him] with any drugs or guns or involved in any drug or gun deals," and that Detective George "failed to advise the state magistrate judge of this information," [Doc. 25 at 9], "[s]uch evidence, while obviously valuable, is not required" since the "issuance of a search warrant is based on probabilities[,] . . . using a practical, common-sense approach . . . [to] determine whether there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Johnson, No. CR11–2025, 2011 WL 4054852, at *5 (N.D. Iowa Sept. 12, 2011) (citation and internal marks omitted). Moreover, while Barnes argues that the references to "heat checks" in the affidavit mischaracterize innocent conduct, [Doc. 82 at 19-22], the issuing judge "had ample reasons, based on the information set forth in the affidavit, to accept the opinions and conclusions of the affiant," based on the affiant's "training and experience[] interpreting the actions and conduct of the subjects of the investigation[.]" United States v. Flores, No. 1:05-cr-558-WSD-JFK, 2007 WL 2904109, at *47 (N.D. Ga. Sept. 27, 2007), adopted at *15. Indeed, "based on the expertise and experience of officers and agents, such as [Detective George], even seemingly innocent activity may provide a basis for finding probable cause." Id., at *48 (citations and internal marks omitted). Furthermore, because the Court finds that the information related to Spencer and the March 26, 2014, traffic stop should not be removed from the probable cause determination, Barnes' staleness argument is without merit. Indeed, evidence of ongoing criminal activity will generally defeat a claim of staleness, see United States v. Hooshmand, 931 F.2d 725, 735 (11th Cir. 1991), and here, the search warrant was obtained immediately following Barnes' arrest, which arose out of an ongoing investigation that began in July, 2013. Evidence seized from the residence is not therefore due to be suppressed on grounds that the information in Detective George's affidavit was stale.

### b.     Good Faith Exception

Even if the search warrant in this case were found to be invalid, suppression of the evidence seized from the residence would not be warranted because the officers executing the warrant reasonably relied in good faith on the validity of the warrant.  See United States v. Leon, 468 U.S. 897, 922-23 (1984).  Under Leon, "the exclusionary rule should not be applied to exclude evidence seized pursuant to a defective search warrant if the officers conducting the search acted in 'objectively reasonable reliance' on the warrant and the warrant was issued by a detached and neutral magistrate."  United States v. Sharp, Civil Action File No. 1:14–cr–229–TCB, 2015 WL 4641537, at *14 n.18 (N.D. Ga. Aug. 4, 2015), adopted at *5 (citations and internal marks omitted); see also United States v. Robinson, 336 F.3d 1293, 1295-96 (11th Cir. 2003).

There are four exceptions to the Leon good-faith exception doctrine, none of which apply here:

> (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role in the manner condemned in Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient-i.e., in failing to

46

particularize the place to be searched or the things to be seized-that the executing officers cannot reasonably presume it to be valid.

United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002) (citation and internal marks omitted).  Though Barnes argues that Detective George "misled the state magistrate judge by submitting information that [he] knew was not true" in relation to Spencer and the alleged unlawful March 26, 2014, traffic stop, and that "[o]nce the [Spencer] March 12, 2014 arrest and the March 26, 2014 traffic stop and search of [Barnes] are removed from the affidavit, there is essentially nothing left," [Doc. 82 at 24-25], as discussed *supra*, these arguments are without merit.  In addition, Barnes does not argue, and there is nothing in the record to suggest, that the magistrate reviewing the affidavit and signing the search warrant engaged in any misconduct or abrogation of judicial responsibility.  As discussed *supra*, the affidavit set forth sufficient probable cause, and in any case is not "so lacking . . . as to render official belief in its existence entirely unreasonable."  Martin, 297 F.3d at 1313.

Finally, the warrant is facially valid in that it describes in sufficient detail the things to be seized, the location for the search, and it is signed by a magistrate. Officers executing the warrant would therefore have been justified in believing in its validity, and evidence seized during the execution would not be subject to suppression. Massachusetts v. Sheppard, 468 U.S. 981, 988-90 (1984).  Accordingly,

it is **RECOMMENDED** that Barnes' motion to suppress evidence arising from the search of the residence, [Doc. 25], be **DENIED**.

## III.  CONCLUSION

For the foregoing reasons and cited authority, Barnes' motions to correct errors in the transcripts, [Doc. 77], and for leave to file a sur-reply, [Doc. 86], are **GRANTED**, and it is hereby **RECOMMENDED** that Barnes' motions to suppress evidence, [Docs. 24 & 25], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 18th day of August, 2015.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE